United States District Court
Middle District of Florida
Jacksonville Division

**ANTHONY HAIRSTON,**

 *Plaintiff,*

v.                 **NO. 3:16-CV-733-J-PDB**

**COMMISSIONER OF SOCIAL SECURITY,**

 *Defendant.*

---

## Order Affirming Commissioner's Decision

 This is an action under 42 U.S.C. § 405(g) to review a final decision of the Commissioner of Social Security denying Anthony Hairston's claim for disability insurance benefits. He seeks reversal, Doc. 18; the Commissioner, affirmance, Doc. 23. He complains the Administrative Law Judge ("ALJ") incorrectly found a cane was neither prescribed nor medically necessary and as a result erroneously failed to include a related residual-functional-capacity limitation in the hypothetical to the vocational expert. Doc. 18 at 7−9.

## Background

 Hairston was born in 1969. Tr. 166, 171. He is a high-school graduate. Tr. 31−32. He has worked as a cook, sorter, banquet supervisor, and forklift operator. Tr. 171. He alleges he became disabled and stopped working in June 2011, listing as impairments injuries to his neck, back, shoulder, and arm from a work-related accident, arthritis and pain in his lumbar spine, herniated nucleus pulposus in his cervical spine, carpal tunnel syndrome, and high blood pressure. Tr. 170. He is insured through 2016. Tr. 166. He proceeded through the administrative process, failing at each level. Tr. 1–4, 10–18, 89–91, 98–100. This case followed.

# Evidence[1]

Hairston settled a worker's compensation claim resulting from the work-related accident. Tr. 163, 164.

A handwritten clinic note by Brandon Kambach, M.D., in September 2011 lists the word "cane" under a section titled "Plan of Care." Tr. 532. Typed treatment notes from that day do not mention a cane. Tr. 521–23. In January 2012, David Doward, M.D., observed Hairston walked with "a slow, but stable gait." Tr. 500.

On a "Florida Workers' Compensation Uniform Treatment/Status Reporting Form" completed in February 2012, Dr. Kambach marked a box next to "DME [durable medical equipment] or Medical Supplies" and wrote, "CANE." Tr. 857. The box was in a section titled, "MANAGEMENT TREATMENT PLAN," that included the statements, "The following proposed, subsequent clinical service(s) is/are deemed medically necessary," and "THIS IS A PROVIDER'S WRITTEN REQUEST FOR INSURER AUTHORIZATION OF TREATMENT OR SERVICES." Tr. 857. On a treatment note from that day, Dr. Kambach noted he gave Hairston "a prescription for a cane per his request." Tr. 482.

In March 2012, Hairston participated in a functional capacity evaluation. Tr. 450–56. The report states Hairston "performed with self[-]limited effort and with a high pain focus," he could perform "a minimum" of light work, he could stand frequently or continuously, he could walk occasionally, and he "demonstrated self[-]limited gait testing with cane ambulation preferred." Tr. 450–51, 456.

On a worker's compensation form signed by Dr. Kambach in July 2012, Dr. Kambach did not check the box next to "DME or Medical Supplies" and left the space next to it blank. Tr. 933.

---

[1]The Court adopts the summaries of the evidence in the parties' briefs. Doc. 18 at 2−5; Doc. 23 at 6−12.

In March 2013, Mark Hoffman, M.D., observed Hairston reported using a cane since 2011 and had come to the appointment with a cane but could walk with "a slight antalgic gait without his cane." Tr. 935, 937–38. That same month, based on a recent functional capacity evaluation, Dr. Kambach opined Hairston could frequently sit and occasionally stand and walk. Tr. 972.

In April 2013, Dr. Hoffman observed Hairston arrived with a cane but "was able to walk normally without" it. Tr. 934. In July 2013, he observed Hairston again had a cane but walked without it "slowly with an antalgic gait." Tr. 933. In October 2013, he observed Hairston walked "with a mild antalgic gait without his cane that he uses most of the time." Tr. 932. In January 2014, he observed Hairston brought a cane with him to the appointment but was able to walk without the cane "with a slow but stable gait." Tr. 1030.

At a May 2014 hearing before the ALJ, Hairston testified in pertinent part as follows. He can sit for about 15 or 20 minutes, he can stand for about 3 to 5 minutes, he can walk for about 5 to 10 minutes, and he has trouble climbing stairs. Tr. 42−43. On an ordinary day, his wife helps him out of bed, he does at-home physical therapy for about 20 minutes, and he exercises by walking on the street for about 20 minutes. Tr. 50. He uses a chair in the shower, and his wife helps him get dressed. Tr. 51. He makes simple meals, puts dishes in the dishwasher, and puts clothes in a washer and dryer. Tr. 52. He and his wife have a ministry, and he goes to church twice a week. Tr. 53. He has used a cane since 2011. Tr. 56. Sometime at the beginning of 2012, Dr. Doward prescribed a cane. Tr. 44−47. He walks with a limp and uses the cane every day. Tr. 56.

A vocational expert testified that Hairston had past relevant work as an industrial truck operator.[2] The ALJ then posed several hypotheticals to the

---

[2]The Dictionary of Occupational Titles describes an industrial truck operator:

Drives gasoline-, liquefied gas-, or electric-powered industrial truck equipped with lifting devices, such as forklift, boom, scoop, lift beam and swivel-hook, fork-grapple, clamps, elevating platform, or trailer hitch, to push, pull, lift,

3

vocational expert. Tr. 60–66. In the first hypothetical, the ALJ asked the vocational expert to

> assume an individual of the same age, education, and work experience as the claimant. This individual would have the following limitations. First, limited to work at the light exertional level defined as lifting up to 20 pounds occasionally, lifting and carrying up to 10 pounds frequently; standing and walking for about six hours; and sitting for up to six hours in a normal work day with normal breaks. In addition, limited to no climbing of ladders, ropes, or scaffolds; limited to—let's see, here. Limited to occasional climbing of ramps or stairs; occasional balancing, occasional stooping, occasional kneeling, occasional crouching, and limited to no crawling. Also, limited to frequent overhead reaching with the left, upper extremity. Also, limited to frequent fingering of objects defined as gross manipulation, and that would also be with the left, upper extremity. In addition, this would be for … right-hand dominant individual.

Tr. 61–62. The vocational expert opined the hypothetical individual could not work as an industrial truck driver but could work as a short-order clerk, routing clerk, and cashier II. Tr. 62.

---

> stack, tier, or move products, equipment, or materials in warehouse, storage yard, or factory: Moves levers and presses pedals to drive truck and control movement of lifting apparatus. Positions forks, lifting platform, or other lifting device under, over, or around loaded pallets, skids, boxes, products, or materials or hooks tow trucks to trailer hitch, and transports load to designated area. Unloads and stacks material by raising and lowering lifting device. May inventory materials on work floor, and supply workers with materials as needed. May weigh materials or products and record weight on tags, labels, or production schedules. May load or unload materials onto or off of pallets, skids, or lifting device. May lubricate truck, recharge batteries, fill fuel tank, or replace liquefied-gas tank. May be designated according to article moved as Lead Loader (smelt. & refin.); process in which involved as Stripper Truck Operator (smelt. & refin.); or type of truck operated as Electric-Truck-Crane Operator (any industry); Fork-Lift-Truck Operator (any industry); Tier-Lift-Truck Operator (any industry). May be designated: Burnt-Lime Drawer (concrete prod.); Casting Trucker (foundry); Electric-Freight-Car Operator (r.r. trans.); Electric-Truck Operator (any industry); Gasoline-Truck Operator (any industry); Metal-Storage Worker (nonfer. metal); Package-Lift Operator (any industry).

Dictionary of Occupational Titles 921.683-050.

In the second hypothetical, the ALJ asked the vocational expert to

> assume … this time at the sedentary exertional level, defined as lifting up to 10 pounds occasionally, standing and walking for about two hours, and sitting for up to six hours in an eight-hour work day with normal breaks. In addition, limited to no climbing of ladders, ropes, or scaffolds. Once again, limited to occasional climbing of ramps or stairs, occasional balancing, occasional stooping, occasional kneeling, occasional crouching, and no crawling. … [T]his time limited to occasional overhead reaching bilaterally. Limited, once again, to frequent handling of objects defined as gross manipulation with the left, upper extremity. And limited to frequent fingering of objects defined as fine manipulation with the left, upper extremity. Once again, this is for right-hand dominant individual. And also, this time, with us it/stand [sic] option defined as allowing a person to sit or stand alternatively at will, provided such a person is [within] employer tolerances for off task behavior.

Tr. 64. The vocational expert opined the hypothetical individual could work as an addresser, document preparer, and stuffer, and specified the number of such jobs available in the national economy. Tr. 64.

Hairston's counsel asked the vocational expert if the hypothetical individual could work in those jobs if also limited with the left hand to occasional simple grasping and fine manipulation. Tr. 66. The vocational expert opined the hypothetical individual could not. Tr. 66.

## ALJ's Decision

At step one,[3] the ALJ found Hairston has not engaged in substantial gainful activity since his alleged onset date (June 2011). Tr. 12.

---

[3]The SSA uses a five-step sequential process to decide if a person is disabled, asking whether (1) he is engaged in substantial gainful activity, (2) he has a severe impairment or combination of impairments, (3) the impairment meets or equals the severity of anything in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1, (4) he can perform any of his past relevant work given his residual functional capacity, and (5) there are a significant number of jobs in the national economy he can perform given his residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

5

At step two, the ALJ found Hairston suffers from severe impairments of degenerative disc disease, "left carpal tunnel release surgery," hypertension, and post-laminectomy syndrome. Tr. 12.

At step three, the ALJ found Hairston's impairments, individually or in combination, do not meet or medically equal the severity of any Listing of Impairments, 20 C.F.R. Part 404, Subpart P, App'x 1. Tr. 12.

The ALJ found Hairston has the residual functional capacity to perform sedentary work[4] with additional limitations:

> [H]e should have a sit/stand option allowing him to sit or stand alternatively, at will, provided this person is within employer tolerances for off task behavior. He should avoid climbing ladders, ropes, or scaffolds and crawling. He can occasionally climb ramps/stairs, balance, stoop, kneel, and crouch. He can occasionally reach overhead, bilaterally. He can engage in frequent handling of objects (defined as gross manipulation) with his left[,] upper extremity. He can engage in frequent fingering of objects (defined as fine manipulation) with his left[,] upper extremity.

Tr. 12–13. The ALJ observed he is right-hand dominant. Tr. 13.

The ALJ summarized the evidence. Tr. 13–17. She found Hairston's testimony about his symptoms and ability to function were "not entirely credible." Tr. 14. She included in the summary:

> The claimant began treating with Dr. Mark Hoffman, who is board certified in physical medicine and rehabilitation, in 2013. Dr. Hoffman opined the claimant could work with restrictions of no lifting or carrying greater than 10 pounds, avoidance of overhead reaching or repetitive bending, pulling, pushing, or twisting, and alternation between sitting and standing. He provided pain management with visits on April 18, 2013, July 23, 2013, and October 10, 2013. Treatment records note

---

[4]"Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 C.F.R. § 404.1567.

6

benefit with medication but reports of pain levels of 8 on a 10 point scale. **There is mention of the use of a cane at times, but this was not prescribed and Dr. Hoffman noted the claimant was able to walk normally.**

Tr. 16 (emphasis added). Elsewhere, she stated:

> **Though it was noted that he used a cane on occasion, there is no evidence that this was prescribed, and it is not found to be medically necessary**. The claimant's level of functioning, including the ability to shop, drive, clean, and prepare simple meals all suggest an ability to perform at least a reduced range of sedentary work.

Tr. 17 (emphasis added).

At step four, the ALJ found Hairston has past relevant work as an industrial truck driver (Dictionary of Occupational Titles 921.683-050) performed at heavy strength and cannot perform that work. Tr. 17.

At step five, the ALJ found Hairston's past relevant work as an industrial truck driver was semi-skilled and required skills of "material working" and "industrial truck operator" but "there were no jobs provided at the sedentary exertional level for which there were transferable skills." Tr. 17. The ALJ then found, "Considering the claimant's age, education, work experience, and residual functional capacity, the claimant has acquired work skills from past relevant work that are transferable to other occupations with jobs existing in significant numbers in the national economy." Tr. 17. She continued, "The vocational expert was asked if any occupations exist which could be performed by an individual with the same age, education, past relevant work experience, and residual functional capacity as the claimant, and which require skills acquired in the claimant's past relevant work but no additional skills" and testified the individual could work as an addresser, document preparer, or stuffer." Tr. 18. The ALJ concluded, "Accordingly, although the claimant's additional limitations do not allow the claimant to perform the full range of sedentary work, considering the claimant's age, education and transferable work skills, a finding of "not disabled" is appropriate under the framework of Medical-Vocational Rule 201.29." Tr. 18.

7

## Standard of Review

A court's review of an ALJ's decision is limited to determining whether the ALJ applied the correct legal standards and whether substantial evidence supports his findings. *Moore v. Barnhart*, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence is "less than a preponderance"; it is "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Id.* A court must affirm the decision if substantial evidence supports it, "[e]ven if the evidence preponderates against the … factual findings." *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). A court may not decide facts anew, reweigh evidence, make credibility determinations, or substitute its judgment for the Commissioner's judgment. *Moore*, 405 F.3d at 1211.

## Law

Disability is the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment[,] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).

A claimant has the burden of proving disability. 20 C.F.R. § 404.1512(a)(1). Thus, on an ongoing basis, he must inform the Social Security Administration ("SSA") of or submit all known evidence that relates to disability. *Id.* The evidence must be complete and sufficiently detailed to allow the SSA to determine if he is disabled. 20 C.F.R. § 404.1512(a)(2). If he does not provide the evidence the SSA needs and requests, the SSA will make a decision based on the available evidence. 20 C.F.R. § 404.1516.

Regardless of its source, the SSA "will evaluate every medical opinion" it receives. 20 C.F.R. § 404.1527(c). "Medical opinions are statements from acceptable medical sources that reflect judgments about the nature and severity of … impairment(s), including … symptoms, diagnosis and prognosis, what [one] can still

do despite impairment(s), and … physical or mental restrictions." 20 C.F.R. § 404.1527(a).

An ALJ is not required to "specifically refer to every piece of evidence in his decision, so long as the ALJ's decision … is not a broad rejection which is not enough to enable [a court] to conclude that [the ALJ] considered [the claimant's] medical condition as a whole." *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (internal quotation marks omitted). An erroneous factual statement by an ALJ may be harmless if the ALJ applies the proper legal standard. *Diorio v. Heckler*, 721 F.2d 726, 728 (11th Cir. 1983); *Majkut v. Comm'r of Soc. Sec.*, 394 F. App'x 660, 665 (11th Cir. 2010).

A claimant's residual functional capacity is the most he can still do despite his limitations. 20 C.F.R. § 404.1545(a)(1). The SSA will assess residual functional capacity based on all relevant evidence in the record and will consider all known impairments. 20 C.F.R. § 404.1545(a)(1) & (2). The SSA uses the residual functional capacity at step four to decide if a claimant can perform any past relevant work and, if not, at step five with other factors to determine if there is any other job in significant numbers in the national economy he can perform. 20 C.F.R. § 404.1545(a)(5).

The step-five determination may be accomplished by application of the grids or use of a vocational expert. *Phillips v. Barnhart*, 357 F.3d 1232, 1239–40 (11th Cir. 2004). The grids provide a claimant with an opportunity to qualify for benefits if his impairment does not meet the requirements of a listed impairment. *Id.* at 1240. They consider his age, exertional limitations, educational deficiencies, inability to speak English, and lack of job experience, and direct "a statutorily-required finding" of disabled or not disabled. *Id.* Although the "general rule is that after determining the claimant's residual functional capacity and ability or inability to return to past relevant work, the ALJ may use the grids" to determine if the claimant can perform other jobs, *id.* at 1242, "exclusive reliance on the grids is not appropriate *either* when [the] claimant is unable to perform a full range of work at a given residual functional

9

level *or* when [the] claimant has non-exertional impairments that significantly limit basic work skills," *id.* (quoted authority omitted; emphasis in *Phillips*). If either circumstance exists, the ALJ must consult a vocational expert. *Id.*

If a claimant has both exertional and nonexertional limitations from his impairments, the grids "are considered in determining first whether a finding of disabled may be possible based on the strength limitations alone." 20 C.F.R. Part 404, Subpart P, App'x 2, § 200.00(e)(2). If not, they "provide a framework for consideration of how much the individual's work capability is further diminished" by the limitations. *Id.*

"Skills and their transferability relate to 'work experience' … [and] people's abilities to do occupations different from those they did before becoming impaired." Social Security Ruling 82-41. Skill transferability is an issue if an impairment does not meet or equal a listed impairment but prevents the performance of skilled or semiskilled past relevant work. In a "relatively few" instances, skill transferability will decide if a claimant is disabled. *Id.* If skill transferability is an issue and the ALJ finds that the claimant has a transferable skill, the ALJ must identify in the written decision the skill and the job to which the skill is transferable. *Id.* at *7. "Transferability"—as distinct from using a skill recently learned in school— means "applying work skills which a person has demonstrated in vocationally relevant past jobs to meet the requirements of other skilled or semiskilled jobs." *Id.*

Under the grids, a younger individual (18 to 44) who is limited to sedentary work, has at least a high-school education, and has a history of skilled or semiskilled work will be found not disabled regardless of whether his skills are transferable. 20 C.F.R. Part 404, Subpart P, App'x 2 §§ 201.28, 201.29.[5]

---

[5] Here, it is unclear whether the ALJ found transferable skills or whether the ALJ used the grids, the vocational expert's testimony, or both, but it does not appear to matter to the end result, and Hairston does not raise the absence of clarity as an issue.

10

For a vocational expert's testimony to be substantial evidence, the hypothetical posed must include all of the claimant's impairments. *Winschel v. Comm'r*, 631 F.3d 1176, 1180 (11th Cir. 2011).

According to a Social Security Ruling ("SSR") and a provision in the Program Operations Manual System ("POMS"),

> Under the regulations, "sedentary work" represents a significantly restricted range of work. Individuals who are limited to no more than sedentary work by their medical impairments have very serious functional limitations. …
>
> [T]he rules … take administrative notice that there are approximately 200 separate unskilled sedentary occupations, each representing numerous jobs, in the national economy. Therefore, even though "sedentary work" represents a significantly restricted range of work, this range in itself is not so prohibitively restricted as to negate work capability for substantial gainful activity in all individuals.
>
> Moreover, since each occupation administratively noticed … represents numerous jobs, the ability to do even a limited range of sedentary work does not in itself establish disability in all individuals, although a finding of "disabled" usually applies when the full range of sedentary work is significantly eroded …. In deciding whether an individual who is limited to a partial range of sedentary work is able to make an adjustment to work other than any PRW, the adjudicator is required to make an individualized determination, considering age, education, and work experience, including any skills the individual may have that are transferable to other work, or education that provides for direct entry into skilled work, under the rules and guidelines in the regulations.
>
> …
>
> The term "occupational base" means the approximate number of occupations that an individual has the [residual functional capacity] to perform considering all exertional and nonexertional limitations and restrictions. … A full range of sedentary work includes all or substantially all of the approximately 200 unskilled sedentary occupations administratively noticed ….
>
> Thus, the [residual functional capacity] addressed by a particular rule … establishes an occupational base that at a minimum includes the full range of unskilled sedentary occupations administratively noticed. …

11

> [I]f the individual has no transferable skills or no education or training that provides for direct entry into skilled work, the occupational base … comprises only the sedentary unskilled occupations in the national economy that such an individual can perform.
>
> …
>
> The following sections provide adjudicative guidance as to the impact of various [residual functional capacity] limitations and restrictions on the unskilled sedentary occupational base. The [residual functional capacity] assessment must include a narrative that shows the presence and degree of any specific limitations and restrictions, as well as an explanation of how the evidence in file was considered in the assessment. The individual's maximum remaining capacities to perform sustained work on a regular and continuing basis (what he or she can still do 8 hours a day, for 5 days a week, or an equivalent work schedule) must be stated.
>
> An accurate accounting of an individual's abilities, limitations, and restrictions is necessary to determine the extent of erosion of the occupational base, the types of sedentary occupations an individual might still be able to do, and whether it will be necessary to make use of a vocational resource. The [residual functional capacity] assessment must be sufficiently complete to allow an adjudicator to make an informed judgment regarding these issues.
>
> …
>
> To find that a hand-held assistive device is medically required, there must be medical documentation establishing the need for a hand-held assistive device to aid in walking or standing, and describing the circumstances for which it is needed (i.e., whether all the time, periodically, or only in certain situations; distance and terrain; and any other relevant information). The adjudicator must always consider the particular facts of a case. For example, if a medically required hand-held assistive device is needed only for prolonged ambulation, walking on uneven terrain, or ascending or descending slopes, the unskilled sedentary occupational base will not ordinarily be significantly eroded.
>
> Since most unskilled sedentary work requires only occasional lifting and carrying of light objects such as ledgers and files and a maximum lifting capacity for only 10 pounds, an individual who uses a medically required hand-held assistive device in one hand may still have the ability to perform the minimal lifting and carrying requirements of many sedentary unskilled occupations with the other hand. For example, an individual who must use a hand-held assistive device to aid in walking

or standing because of an impairment that affects one lower extremity (e.g., an unstable knee), or to reduce pain when walking, who is limited to sedentary work because of the impairment affecting the lower extremity, and who has no other functional limitations or restrictions may still have the ability to make an adjustment to sedentary work that exists in significant numbers. On the other hand, the occupational base for an individual who must use such a device for balance because of significant involvement of both lower extremities (e.g., because of a neurological impairment) may be significantly eroded.

In these situations, too, it may be especially useful to consult a vocational resource in order to make a judgment regarding the individual's ability to make an adjustment to other work.

SSR 96-9p[6] and Program Operations Manual System ("POMS") DI 25015.020.[7]

## Analysis

In complaining the ALJ incorrectly found a cane was neither prescribed nor medically necessary and as a result erroneously failed to include a related residual-functional-capacity limitation in the hypothetical to the vocational expert, Hairston points to the form Dr. Kambach signed in February 2012 indicating a cane was medically necessary and requesting insurer authorization for it, Tr. 857, and Hairston's testimony his wife helps him get out of bed, he cannot stand in the shower, he has pain down the right leg, and he uses the cane every day. Doc. 18 at 8−9.

The Commissioner responds substantial evidence supports the residual-functional-capacity determination, pointing to the initial appointment following the

---

[6]SSRs are agency rulings published under the Commissioner's authority and are binding on all components of the SSA. *Sullivan v. Zebley*, 493 U.S. 521, 531 n.9 (1990). They are not binding on a court. *B.B. v. Schweiker*, 643 F.2d 1069, 1071 (5th Cir. Unit B. 1981); *see Stein v. Reynolds Sec. Inc.*, 667 F.2d 33, 34 (11th Cir. 1982) (Eleventh Circuit is bound by decisions issued by Unit B panels of the former Fifth Circuit).

[7]POMS contains "publicly available operating instructions for processing Social Security claims." *Wash. State Dep't of Soc. & Health Servs. v. Guardianship Estate of Keffeler*, 537 U.S. 371, 385 (2003). POMS may be considered persuasive even though it does not have the force of law. *Stoup v. Barnhart*, 327 F.3d 1258, 1262 (11th Cir. 2003).

accident in June 2011 and appointments during 2011, 2012, 2013, and 2014, at which no cane was prescribed and he was released to return first to part-time work and then to full-time work with no restriction concerning the use of a cane. Doc. 23 at 6–10. The Commissioner observes the form Dr. Kambach signed in February 2012 is not a treatment or progress note, Dr. Kambach does not state he is prescribing a cane for Hairston, and Dr. Kambach does not reference treatment notes prescribing a cane, and the Commissioner supposes "it may have simple [sic] reflected Plaintiff's subjective complaint to Dr. Kambach that he needed a cane." Doc. 23 at 11. The Commissioner adds the July 2012 form Dr. Kambach signed did not include the same mark or notation, suggesting a cane was no longer medically necessary. Doc. 23 at 12.

The ALJ's finding that no physician prescribed use of a cane was wrong. Though the February 2012 worker's compensation form does not necessarily suggest Dr. Kambach prescribed a cane at that time, *see* Tr. 857, a treatment note from that day states he gave Hairston "a prescription for a cane per his request," *see* Tr. 482. Nevertheless, the ALJ's error was harmless because she applied the proper legal standard, and substantial evidence supports her finding that a cane was not medically necessary. The February 2012 treatment note showing Dr. Kambach's prescription of a cane indicates he gave the prescription based on Hairston's request and not based on an opinion he needed one, *see* Tr. 482, indicating the statement on the worker's compensation form that a cane was medically necessary was to obtain insurer authorization for the cane. The ALJ described other evidence supporting the finding Hairston did not need a cane. Treatment notes show Hairston walked normally, with a slow but stable gait, or with an antalgic gait without a cane. *See* Tr. 500, 932–34, 938, 1030. A March 2012 functional capacity evaluation states Hairston "performed with self[-]limited effort and with a high pain focus," he could perform "a minimum" of light work, he could stand frequently or continuously, he could walk occasionally, and he "demonstrated self[-]limited gait testing with cane ambulation preferred." Tr. 450–51, 456. And in March 2013, Dr. Kambach opined Hairston could

14

frequently sit and occasionally stand and walk. Tr. 972. He did not mention any need for a cane.[8]

Other records mention Hairston's use of a cane, but they do not undermine the ALJ's finding. A handwritten clinic note by Dr. Kambach from September 2011 simply lists the word "cane," *see* Tr. 532; it is unclear whether that reflects Dr. Kambach's opinion Hairston needed one or just Hairston's request for one. Typed treatment notes from the same day do not mention a cane, though they mention all other prescribed or recommended treatment listed in the clinic note, including medication and physical therapy. *See* Tr. 521–23. Other treatment notes show doctors had observed Hairston using a cane, *see* Tr. 932–35, 937, 1030, but those observations are not evidence a cane was medically necessary, and the notes reflect that he could walk without one. None of the medical records mentioning Hairston's use of a cane describe the circumstances in which Hairston would need to use one. Likewise, though Hairston testified at the hearing that he walks with a limp and uses the cane every day, he provided no testimony concerning the circumstances under which he uses a cane and whether he needs it at all times. Tr. 56.

Because substantial evidence supports the ALJ's finding a cane was not medically necessary, she did not have to include a limitation concerning use of a cane in the residual-functional-capacity finding.

---

[8]The Commissioner observes Dr. Kambach did not indicate a cane was medically necessary on a July 2012 worker's compensation form. *See* Doc. 23 at 12 (citing Tr. 420). Given that the purpose of that section of the form was to obtain insurer authorization for the listed treatment, Dr. Kambach's exclusion of the need for a cane from the form does not necessarily mean he no longer believed a cane was medically necessary. Moreover, Dr. Kambach checked a box on the form indicating there had been "[n]o change" in the management and treatment plan since he submitted the February 2012 form. *See* Tr. 420.

**Conclusion**

The Court affirms the Commissioner's decision and directs the clerk to enter judgment in favor of the Commissioner and close the file.

**Ordered** in Jacksonville, Florida, on September 13, 2017.

_____
PATRICIA D. BARKSDALE
*United States Magistrate Judge*

c:	Counsel of record